In the MATTER OF ASSESSMENT OF JURY FEES AGAINST Patricia O'NEIL and Office of State Public Defender in, State of Wisconsin v. Christopher J. Murphy:

Patricia O'NEIL and Office of State Public Defender, Appellants,

v.

MONROE COUNTY CIRCUIT COURT, Respondent.

Court of Appeals

*No. 02–2866. Submitted on briefs March 10, 2003.—Decided June 12, 2003.*

2003 WI App 149

(Also reported in 667 N.W.2d 774.)

On behalf of the appellants, the cause was submitted on the briefs of *Tracey J. Lencioni*, assistant state public defender of Madison.

On behalf of the respondents, the cause was submitted on the brief of *David C. Rice*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Vergeront, P.J., Dykman and Roggensack, JJ.

¶ 1. DYKMAN, J.   Assistant Public Defender Patricia O'Neil and the Office of the State Public Defender appeal from an order assessing the cost of impaneling a jury against O'Neil. The trial court imposed the fees on O'Neil when she requested an adjournment on the first day of trial rather than proceed without her expert witness. Because we conclude that the trial court erroneously exercised its discretion when it ordered O'Neil to pay the jury costs, we reverse.

## BACKGROUND

¶ 2.   O'Neil represented Christopher Murphy, who was charged with one count of first-degree sexual assault of a child. In response to Murphy's motion for a speedy trial, the trial court scheduled a jury trial for January 3, 2002. The pretrial discovery order required the defense to provide its witness list to the State "within a reasonable time prior to jury trial." Similarly, in accordance with the defense's WIS. STAT. § 971.23 (2001–02)[1] discovery demand, the State was to provide

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

the defense with the names of all its witnesses "within a reasonable time before trial."

¶ 3. On December 27, 2001, Assistant District Attorney Brian Ekern sent the State's witness list to O'Neil's office. The witness list was addressed to Assistant Public Defender Allan Beatty, not O'Neil. O'Neil was on vacation that week, a fact of which the assistant district attorney was aware. As a result of her vacation and the New Year's holiday, the first working day that O'Neil was able to address the witness list was January 2, the day before Murphy's trial. At that time O'Neil had not yet submitted her witness list to the State, as the general practice in Monroe County was for the defense to wait until it received the State's witness list before responding with its own list.

¶ 4. When O'Neil saw the alleged victim's father on the State's witness list, she realized that the State was likely to raise as an issue the fact that the father had seen blood in his daughter's underwear while doing the laundry. The criminal complaint alleged that Murphy had inserted his fingers in the victim's vagina, and the day of the alleged assault was the only day that the victim observed blood in her underwear. For these reasons O'Neil concluded that expert testimony regarding the onset of menstruation was necessary to refute any argument by the State that Murphy's criminal conduct must be the cause of the blood. That same day, January 2, 2002, O'Neil obtained Dr. Laurie Logan as an expert witness to testify about menstruation. O'Neil called and informed opposing counsel that Dr. Logan would appear as an expert witness for the defense.

¶ 5. On January 3, 2002, the day of trial, the State objected to the defense naming Dr. Logan as an expert witness, arguing that O'Neil had not provided the name of the defense's expert "within a reasonable time before

trial" because the State had received the defense witness list only the day before. The State asked the trial court to preclude Dr. Logan from testifying under WIS. STAT. § 971.23(7m).[2] In response, O'Neil explained that she did not see the State's witness list until she returned to her office after her vacation. She added that if the trial court did not allow Dr. Logan to testify, she would have to ask for an adjournment to ensure that Murphy received a fair trial.

¶ 6.   The trial court observed that it didn't think either witness list had been provided within a reasonable time of trial. It then stated that its options were either to grant the State's motion and preclude Dr. Logan from testifying or to adjourn the proceedings and reset the trial for a later date.[3] After consulting with her client, O'Neil requested an adjournment. The trial court granted the request and excused the jury panel. It then held a brief hearing to address assessing the jury costs. When neither O'Neil or Assistant District Attorney Ekern offered any comments on the issue, the trial court made the following statement:

> Here there's no question that the inclusion of an
> expert witness is one that necessitated the delay. Had it

---

[2] WISCONSIN STAT. § 971.23(7m) provides in pertinent part: "(a) The court shall exclude any witness not listed or evidence not presented for inspection or copying required by this section, unless good cause is shown for failure to comply. The court may in appropriate cases grant the opposing party a recess or a continuance."

[3] There was a third option. WISCONSIN STAT. § 971.23(7m) provides for witness exclusion "unless good cause is shown for failure to comply." The trial court did not consider whether the State's unreasonably short notice was good cause to permit Dr. Logan to testify.

been know earlier, we would not have had this and it is not fair to the citizens of Monroe County that they pay these expenses.

I respect the right that the defense has to ask for an adjournment and that's really why—the reason why I gave an alternative. I expect that as far as the defense is concerned there was really no alternative, that in order to defend the case that the doctor was needed, but in order to have the doctor testify, clearly it would have been appropriate to give the State more notice. So the defense will be required to pay the panel costs. You jokingly asked about a payment plan earlier. What I'd like you to do is—

. . . .

—discuss—well, discuss with your office payment, I believe that your office will pay it, but I'm sure it is well over $1,000.00 based on the conversation that I've had with our clerk.

The trial court then ordered the State Public Defender's Office to pay the cost of impaneling the jury. A written order to that effect followed on January 14, 2002, setting the amount at $1,111.95.

¶ 7. The SPD appealed. On April 29, 2002, we set aside the trial court's order pursuant to a stipulation between the trial court and the SPD. This order was without prejudice so that on remand the trial court could assess the cost of impaneling the jury against the individual trial attorneys.[4]

¶ 8. At the hearing following remand O'Neil objected to proceeding without the assistant district attorney because she understood the issue to be whether

---

[4] Our order uses the plural term "attorneys."

the jury costs could be assessed against the individual attorneys. The trial court explained:

> Now, the reason that there were no fees assessed against the District Attorney's office was there was no objection from the defense, there was no motion from the defense asserting that the time period in which the State notified you of their witnesses would have prevented you from going to trial; and the comment that I made was that I didn't believe that either of you had given one another notice within a reasonable period of time. The State felt that it was not able to proceed under the circumstances and I can understand that, that was not the same assertion from the defense.

O'Neil responded that on January 3, 2002, she had been "quite stunned" by the turn of events, and she had not thought that the court was going to assess the jury costs only against the defense and not the State. At this point the hearing was adjourned until May 31, 2002.

¶ 9.   When the hearing reconvened O'Neil testified that "[t]here was no formal practice for exchanging witness lists any particular amount of time in advance of trial . . . ." She said that she did not in any way act in bad faith with respect to providing the witness list and had been prepared to go to trial on January 3, 2002. She acknowledged that the practice of exchanging witness lists "was basically invisible to the court."

¶ 10.   Expressing its concern that it was unfair for the county taxpayers to pay for the jury in this situation, the trial court assessed the jury costs against O'Neil. It decided to impose the costs only on the defense because, "number one, when we had the hearing the defense did not raise any issue, raise any objection about the State not filing their witness list

within a reasonable time prior to trial and had that happened, I surely would have taken that into consideration as well."

¶ 11.  The trial court expanded on its reasoning in a written decision. After noting that, as a result of the postponement of his trial, Murphy (who was ultimately acquitted following a jury trial at which Dr. Logan testified) spent an additional sixty-four days in jail awaiting trial, the trial court wrote that "[d]isclosing the name of an expert witness one intends to call within less than twenty-four hours prior to the commencement of trial is not reasonable. As the State pointed out, · it gave them no opportunity to prepare for the testimony of the named expert." However, the trial court also found that the State had not complied with its obligation under Wis. Stat. § 971.23(1)(d) to provide its witness list within a reasonable time of trial:

> The defense ought not be placed in the position of selecting the state's possible witnesses from discovery materials no matter how early in the proceedings provided . . . . [T]he state's only witness subpoena was dated December 21, 2001. I believe the defense *should have* been informed of the names of the intended witnesses when the subpoena was prepared. Under all of the circumstances the state's disclosure was not within a reasonable time before trial.

¶ 12.  Nevertheless, the trial court repeated its earlier conclusion that it was appropriate to impose the cost of impaneling the jury solely on the defense because O'Neil had failed to object to the State's tardy submission of its witness list. According to the trial court, "[t]he time to complain, if indeed the defense believed the state's disclosure was untimely, was *prior to* the trial date . . . . If the defense considered the state's disclosure not to have been within a reasonable

162

time before trial, the defense should have objected." Rejecting the suggestion that imposing jury costs should be limited to cases where an attorney had acted in bad faith, the trial court assessed the cost of impaneling the jury on January 3, 2002, a sum of $1,111.95, against O'Neil.

## DISCUSSION

¶ 13. The trial court has inherent authority to assess the cost of impaneling a jury against a party. *State v. Foster*, 100 Wis. 2d 103, 109, 301 N.W.2d 192 (1981). "The purpose of imposing jury costs is to deter disruptive practices that contribute to inefficiency in the court system." *House v. Circuit Ct. for Marinette County*, 112 Wis. 2d 14, 17, 331 N.W.2d 859 (Ct. App. 1983). The trial court is not limited to imposing costs on parties, but may sanction an attorney whose conduct "negligently disrupts the court's orderly administration of justice." *Id.* We review the trial court's order assessing costs for an erroneous exercise of discretion. *Anderson v. Circuit Ct. for Milwaukee County*, 219 Wis. 2d 1, 9, 578 N.W.2d 633 (1998). The trial court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law and, using a demonstrated rational process, reaches a conclusion that a reasonable court could reach. *Id.*

¶ 14. O'Neil contends that her actions in response to the State's witness list were not negligent and therefore it was inappropriate for the trial court to assess the jury costs against her. The trial court concluded that O'Neil should have objected when she received the State's witness list so close to trial. O'Neil

163

asserts that she had no reason to object because, despite the late notice, she managed to find an expert witness and she promptly informed the State that Dr. Logan would testify for the defense. She claims that it is unfair for the trial court to penalize her when it was the State's conduct that precipitated her inability to provide the defense witness list until the day before trial. Further, O'Neil submits that the trial court's main concern was not to deter dilatory practices by the Monroe County criminal bar but to ensure that the county recouped the cost of impaneling the jury. She argues that the trial court's order will have no deterrent effect because the last-minute, informal practice for exchanging witness lists in Monroe County no longer exists. Under a new procedure, witness lists must be provided to opposing counsel no later than ten days before trial.

¶ 15. The trial court argues that despite the State's late notice of its witnesses, O'Neil's filing was still contrary to the written discovery order. Given the nature of the allegations against Murphy, the court contends, O'Neil could be expected to have anticipated that expert testimony would be necessary.[5] Finally, the court asserts that the imposition of jury costs is still a valid deterrent because the new ten-day deadline does not eliminate the possibility that an attorney will fail to provide a witness list within the allotted time, and the unnecessary expense to the county is a proper factor to consider under *House*, 112 Wis. 2d at 18.

---

[5] This would have required O'Neil to hire an expert witness, at State of Wisconsin expense, when she was not sure the witness would be necessary.

¶ 16. The trial court correctly concluded that bad faith on the part of an attorney was not a prerequisite to imposing jury costs, because the order and efficiency of the court system is as easily disrupted by negligent conduct as by bad faith conduct. *Id.* at 16–17. However, it is also important that each case be considered "in the light of the particular facts and circumstances." *Jacobson v. Avestruz*, 81 Wis. 2d 240, 247, 260 N.W.2d 267 (1977).

¶ 17. O'Neil testified without contradiction that the practice in Monroe County was for the defense to wait until the State provided its witness list before responding with its own list of witnesses. It was not unusual for witness lists to be exchanged "at the very last moment" in Monroe County. The State's witness list was not prepared until December 27, 2001. Assistant District Attorney Ekern knew that O'Neil was on vacation that week. As a result of the New Year's holiday and her vacation, the first working day that O'Neil could deal with the State's witness list was January 2, the day before trial. When O'Neil saw the victim's father on the list, she quickly obtained Dr. Logan as an expert to testify and provided her list of witnesses to the State that same day.

¶ 18. The trial court did not express any doubts regarding the accuracy of O'Neil's testimony or her credibility. It did not question that, although formerly "invisible to the court," the custom was to provide witness lists shortly before trial, often orally. Nor did it single out O'Neil's actions for criticism. The trial court found that by waiting until December 27, the State had also failed to provide its witness list "within a reasonable time before trial." This is where the problem lies. O'Neil cannot be criticized for following a local custom, which was to respond to the State's list of witnesses.

While O'Neil knew the nature of her case, she had no way to know that the assistant district attorney would call as a witness the father of the alleged victim.

¶ 19.   We agree with the trial court that "[c]ounsel cannot seek discovery orders and thereafter ignore them." But the time period in the discovery order was uncertain, leaving it open to debate what constitutes "a reasonable time before trial." In light of the ambiguous discovery order and the informal manner in which counsel generally exchanged witness lists, O'Neil had no notice that instead of scrambling to obtain an expert witness and being prepared to go to trial on January 3, she was required to object to the State's list to avoid sanctions.

¶ 20.   O'Neil had no problem with the contents of the State's witness list. She was able to respond to that list by obtaining a rebuttal witness. We see nothing to which O'Neil was required to object. She was prepared and willing to go to trial despite the State's tardy witness list.

██

¶ 21.   A trial court's proper exercise of discretion ensures public and attorney confidence that all will receive equitable treatment. *Anderson*, 219 Wis. 2d at 10. But the trial court's order does not reflect the reason O'Neil replied when she did, the assistant district attorney's role in the ensuing problem and the fact that the scheduling order was ambiguous. The question at the court's hearing was whether O'Neil was negligent. That required an inquiry into all that had occurred. Whether O'Neil objected to the assistant district attorney's tardy notice was irrelevant. Given the facts and circumstances of this case, we conclude that O'Neil's conduct does not rise to a level of negligence that warrants imposing jury costs under *House*. Accord-

166

ingly, we conclude that the trial court erroneously exercised its discretion when it ordered O'Neil to pay for the cost of impaneling the jury.

*By the Court.*—Order reversed.